## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DISTRICT

| | |
|---|---|
| MERCEDES BENZ USA LLC,<br>Plaintiff,<br><br>v.<br><br>DANIEL BOMBARDIER,<br><br>Defendants. | 2:19-CV-10951-AC-EAS<br>Honorable Avern Cohn<br>District Court Judge<br><br>Honorable Elizabeth A. Stafford<br>Magistrate Judge<br><br>**DECLARATION OF JEFFREY GLUCK IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |

I, Jeffrey Gluck, hereby declare as follows:

1.      I am an attorney authorized to practice in California and New York, and counsel for Defendant Daniel Bombardier ("Bombardier") in this action. I have personal knowledge of the matters set forth herein, and if called upon to testify, could and would competently do so.

2.      In its Complaint, Plaintiff Mercedes Benz USA LLC ("MBZ") acknowledges only limited use of Bombardier's mural, stating that it used the mural "in one of [MBZ's] Instagram posts about its G 500 Series truck." MBZ vastly understates its infringement. MBZ widely published and distributed (and continues to publish) infringing photos well beyond a single Instagram post. Indeed, as shown in the attached Exhibit A, MBZ is still using the photos as advertising material on its corporate website.

3.     MBZ is a frequent and prolific user of graffiti in its advertising. For example, on the *same day* MBZ filed this lawsuit, it posted a four-minute video "brochure" for its 2019 G-Class vehicle, prominently featuring a mural by French street artist Astro. This video is featured on MBZ's YouTube channel which has over 430,000 subscribers. https://www.youtube.com/watch?v=XweXBYap_G0 (last visited April 11, 2019). A screenshot of this video is attached as Exhibit B. As of April 11, 2019, the video has been viewed over 163,000 times.

4.     On or about March 1, 2019, I contacted MBZ's counsel in New York to demand that MBZ cease and desist using images featuring Bombardier's work, and continued corresponding via email and telephone with MBZ's New York counsel up until March 29, 2019 when, without warning, MBZ filed its Complaint. None of this correspondence occurred in Michigan, nor was it directed to anyone in Michigan.

5.     It has been widely reported that MBZ is domiciled in Atlanta, Georgia, having relocated its headquarters there in 2017. MBZ's announcement of this relocation was reported in a January 6, 2015 article published by Reuters, a true and correct copy of which is attached as Exhibit C.

6.     Attached as Exhibit D is a true and correct copy of House of Representatives Report 101-735, re the Copyright Amendments Act of 1990, published September 21, 1990; which I obtained from Lexis Nexis.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed April 23, 2019, at Los Angeles, California.

_____/s/_____

Jeffrey Gluck

## <u>Certificate of Service</u>

I certify that on April 24, 2019, I electronically filed the foregoing paper with the

Clerk of the Court using the EFC system which sends notification of such filing to

all counsel of record.

> <u>/s/ Lisa Kwiecinski</u>
> Lisa Kwiecinski
> Legal Assistant
> Lippitt O'Keefe Gornbein, PLLC
> 370 E. Maple Road, 3rd Floor
> Birmingham, MI 48009
> (248) 646-8292
> lkwiecinski@lippittokeefe.com

{00304803}

# EXHIBIT A.

All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz    4/11/19, 1:59 PM



G-CLASS

# All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort

Mercedes-Benz is kicking of 2018 with the relaunch of one of the brands most recognizable models on the road

WORDS **ANNA JAMES**
JANUARY 17, 2018

Mercedes-Benz is kicking of

Mercedes-Benz is kicking of 2018 with the relaunch of one of the brands most recognizable models on the road. Starring in

## 2018 with the relaunch of one of the brands most recognizable models on the road



G-CLASS

WORDS **ANNA JAMES**
JANUARY 17, 2018

Detroit at the North American International Auto Show (NAIAS), Mercedes revealed and put on full display the all new and exceptionally capable and now road worthy G-Class. The off-road legend will has underwent its biggest makeover in its history, maintaining all of its off-roading abilities but adding in comfort only found in a Mercedes-Benz.

The most recognizable changes are on the inside. Unlike the previous-generation G-Class that wasn't quite up to date in terms of interior comforts, the 2019 model is filled with creature comforts. Like other new Mercedes models, you can choose from a variety of options including having the dashboard loaded with dual 12.3-inch screens. The interior also got a massive expansion. Legroom up front has an increase of 1.5 inches and rear legroom is extended by a massive 5.9 inches. Shoulder and hip room also sees improvement in both rear rows between 1 and 3 inches.

If you're a fan of the original interior, you're likely cursing Mercedes-Benz and their design team.  Curse not, several traditional G-Class hallmarks remain, including the passenger grab handle and the three differential locks on the center stack. Both rows have standard heated seats, with massage and rapid-heating functions available as an option.

To start, the G-Class will be available in just the G550 trim. The engine is a 4.0-liter V8 putting out 416 horsepower and 450 pound-feet of torque. it comes mated to a new nine-speed automatic transmission. Expect AMG variants to arrive later on, likely at other auto shows throughout this year and 2019.

The previous model had awful recirculating-ball steering, but this new G-Class packs a vastly improved electromechanical rack-and-pinion setup. There's also a new front independent suspension, but the rear retains its old-school solid rear axle.

the G-Class packs a new "G-Mode." This mode automatically turns on when one of the differential locks engages. It changes the dampers, steering and throttle systems to work better in off-road situations.

The 2019 Mercedes-Benz G-Class will go on sale later this year. Pricing will be announced closer to the launch date.





All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz                                    4/11/19, 1:59 PM







All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz
4/11/19, 1:59 PM







All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz

4/11/19, 1:59 PM









All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz                    4/11/19, 1:59 PM

















All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz

4/11/19, 1:59 PM





All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz

4/11/19, 1:59 PM







All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz    4/11/19, 1:59 PM







4/11/19, 1:59 PM



All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz

4/11/19, 1:59 PM







All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz          4/11/19, 1:59 PM





All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz                4/11/19, 1:59 PM







All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz

4/11/19, 1:59 PM

















All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz

4/11/19, 1:59 PM

















All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz                    4/11/19, 1:59 PM













All New Mercedes-Benz G-Class Offers Off-Road Dominance and Driving Comfort | eMercedesBenz                    4/11/19, 1:59 PM



In addition to the G-Class, also on display at NAIAS are three new models and a new model designation. Luanching is the 53-series models of the CLS, E-Class Coupé and E-Class Cabriolet (combined fuel consumption: 8.5 – 8.4 l/100 km; combined CO2 emissions: 201 – 200 g/km).

They combine powerful performance with sporty style and high efficiency. At their heart lies a new, electrified 3.0-litre engine featuring twin-turbocharging by means of an exhaust gas turbocharger and an electric auxiliary compressor. The 6-cylinder in-line engine generates 320 kW (435 hp) and delivers maximum torque of 520 Nm.

MORE: AUTOS, MERCEDES-BENZ, G-CLASS      

01 / 81





# EXHIBIT B.

≡  ▶YouTube



▶ ⏭ 🔊  0:26 / 4:28                                                  CC ⚙ ◻ ▢ ⬜ ⬛ ⛶

Mercedes-Benz 2019 G-Class - Video Brochure

163,930 views                                                    👍 3.2K   👎 186   ➤ SHARE   ⬇ SAVE   •••

  Mercedes-Benz USA ✓                                              SUBSCRIBE 433K
Published on Mar 29, 2019

After 40 years, Mercedes-Benz's most iconic SUV, the G-Class, gets an upgrade. This film highlights
the new features of the redesigned 2019 G-Class, Including a state-of-the-art cockpit and updated
exterior trims. Learn more about the 2019 G-Class at: https://www.mbusa.com/en/vehicles/cla ...

To see all of our latest videos, subscribe to our YouTube Channel.
https://www.youtube.com/user/mbusa

# EXHIBIT C.

# Mercedes-Benz says will move U.S. headquarters to Atlanta

Dieter Zetsche, head of Mercedes-Benz cars, looks on during the 2015 International Consumer Electronics Show (CES) in Las Vegas, Nevada January 5, 2015. REUTERS/Steve Marcus

DETROIT (Reuters) - Mercedes-Benz will move its U.S. headquarters to Atlanta from northern New Jersey, affecting about 1,000 employees, the company said on Tuesday.

The Daimler AG unit is moving to cut costs, including those for cost-of-living and taxes, a source familiar with the brand's plans said earlier on Tuesday.

The new headquarters would be closer to the company's assembly plant in Tuscaloosa, Alabama and its port in Brunswick, Georgia. The current headquarters is in Montvale, New Jersey.

Mercedes-Benz, the No. 2 seller of luxury automobiles in the United States, said the move would "better serve its growing customer base and strengthen the company's position for long-term, sustainable growth."

"The state (of New Jersey) has worked tirelessly with us as we evaluated our options," Steve Cannon, U.S. chief of the brand, said in a statement.

"Ultimately, though, it became apparent that to achieve the sustained, profitable growth and efficiencies we require for the decades ahead, our headquarters would have to be located elsewhere."

Reporting by Bernie Woodall; Editing by Chizu Nomiyama and Richard Chang

Mercedes-Benz says will move U.S. headquarters to Atlanta - Reuters

4/11/19, 2:19 PM

# EXHIBIT D.

| 101st Congress 2d Session | HOUSE OF REPRESENTATIVES | Report 101-735 |

## COPYRIGHT AMENDMENTS ACT OF 1990

---

September 21, 1990.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

---

Mr. Brooks, from the Committee on the Judiciary, submitted the following

## R E P O R T

[To accompany H.R. 5498]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill (H.R. 5498) to amend title 17, United States Code, relating to computer software, fair use, and architectural works, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Copyright Amendments Act of 1990".

### TITLE I—COMPUTER SOFTWARE

**SEC. 101. SHORT TITLE.**

This title may be cited as the "Computer Software Rental Amendments Act of 1990".

**SEC. 102. RENTAL OF COMPUTER PROGRAMS.**

Section 109(b) of title 17, United States Code, is amended—

(1) by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), respectively;

(2) by striking paragraph (1) and inserting the following:

"(b)(1)(A) Notwithstanding the provisions of subsection (a), unless authorized by the owners of copyright in the sound recording or the owner of copyright in a computer program (including any tape, disk, or other medium embodying such program), and in the case of a sound recording in the musical works embodied therein, neither the owner of a particular phonorecord nor any person in possession of a particular copy of a computer program (including any tape, disk, or other medium embodying such program), may, for the purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord or computer program (including any tape, disk, or other medium embodying such

39–060

2

program) by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending. Nothing in the preceding sentence shall apply to the rental, lease, or lending of a phonorecord for nonprofit purposes by a nonprofit library or nonprofit educational institution. The transfer of possession of a lawfully made copy of a computer program by a nonprofit educational institution to another nonprofit educational institution or to faculty, staff, and students does not constitute rental, lease, or lending for direct or indirect commercial purposes under this subsection.

"(B) This subsection does not apply to—

"(i) a computer program which is embodied in a machine or product and which cannot be copied during the ordinary operation or use of the machine or product; or

"(ii) a computer program embodied in or used in conjunction with a limited purpose computer that is designed for playing video games and may be designed for other purposes.

"(C) Nothing in this subsection affects any provision of chapter 9 of this title.

"(2)(A) Nothing in this subsection shall apply to the lending of a computer program for nonprofit purposes by a nonprofit library, if each copy of a computer program which is lent by such library has affixed to the packaging containing the program a warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

"(B) Not later than three years after the date of the enactment of the Computer Software Rental Amendments Act of 1990, and at such times thereafter as the Register of Copyright considers appropriate, the Register of Copyrights, after consultation with representatives of copyright owners and librarians, shall submit to the Congress a report stating whether this paragraph has achieved its intended purpose of maintaining the integrity of the copyright system while providing nonprofit libraries the capability to fulfill their function. Such report shall advise the Congress as to any information or recommendations that the Register of Copyrights considers necessary to carry out the purposes of this subsection."; and

(3) by striking paragraph (4), as redesignated by paragraph (1) of this section, and inserting the following:

"(4) Any person who distributes a phonorecord or a copy of a computer program (including any tape, disk, or other medium embodying such program) in violation of paragraph (1) is an infringer of copyright under section 501 of this title and is subject to the remedies set forth in sections 502, 503, 504, 505, and 509. Such violation shall not be a criminal offense under section 506 or cause such person to be subject to the criminal penalties set forth in section 2319 of title 18.".

## SEC. 103. PUBLIC DISPLAY OF ELECTRONIC VIDEO GAMES.

Section 109 of title 17, United States Code, is amended by adding at the end the following:

"(e) Notwithstanding the provisions of sections 106(4) and 106(5), in the case of an electronic audiovisual game intended for use in coin-operated equipment, the owner of a particular copy of such a game lawfully made under this title, is entitled, without the authority of the copyright owner of the game, to publicly perform or display that game in coin-operated equipment, except that this subsection shall not apply to any work of authorship embodied in the audiovisual game if the copyright owner of the electronic audiovisual game is not also the copyright owner of the work of authorship.".

## SEC. 104. EFFECTIVE DATE.

(a) IN GENERAL.—Subject to subsection (b), the amendments made by this title shall take effect on the date of the enactment of this Act.

(b) PROSPECTIVE APPLICATION.—Section 109(b) of title 17, United States Code, as amended by section 102 of this Act, shall not affect the right of a person in possession of a particular copy of a computer program, who acquired such copy before the date of the enactment of this Act, to dispose of the possession of that copy on or after such date of enactment in any manner permitted by section 109 of title 17, United States Code, as in effect on the day before such date of enactment.

(c) TERMINATION.—The amendments made by section 102 shall not apply to rentals, leasings, or lendings (or acts or practices in the nature of rentals, leasings, or lendings) occurring on or after October 1, 1997.

## SEC. 105. RECORDATION OF SHAREWARE.

(a) IN GENERAL.—The Register of Copyrights is authorized, upon receipt of any document designated as pertaining to computer shareware and the fee prescribed by

3

section 708 of title 17, United States Code, to record the document and return it with a certificate of recordation.

(b) MAINTENANCE OF RECORDS; PUBLICATION OF INFORMATION.—The Register of Copyrights is authorized to maintain current, separate records relating to the recordation of documents under subsection (a), and to compile and publish at periodic intervals information relating to such recordations. Such publications shall be offered for sale to the public at prices based on the cost of reproduction and distribution.

(c) DEPOSIT OF COPIES IN LIBRARY OF CONGRESS.—In the case of public domain computer shareware, at the election of the person recording a document under subsection (a), 2 complete copies of the best edition (as defined in section 101 of title 17, United States Code) of the computer shareware as embodied in machine-readable form may be deposited for the benefit of the Machine-readable Collections Reading Room of the Library of Congress.

(d) REGULATIONS.—The Register of Copyrights is authorized to establish regulations not inconsistent with law for the administration of the functions of the Register under this section. All regulations established by the Register are subject to the approval of the Librarian of Congress.

## TITLE II—ARCHITECTURAL WORKS

**SEC. 201. SHORT TITLE.**

This title may be cited as the "Architectural Works Copyright Protection Act".

**SEC. 202. DEFINITIONS.**

(a) ARCHITECTURAL WORKS.—Section 101 of title 17, United States Code, is amended by inserting after the definition of "anonymous work" the following:

"An 'architectural work' is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.".

(b) BERNE CONVENTION WORK.—Section 101 of title 17, United States Code, is amended in the definition of "Berne Convention work"—

(1) in paragraph (3)(B) by striking "or" after the semicolon;

(2) in paragraph (4) by striking the period and inserting "; or"; and

(3) by inserting after paragraph (4) the following:

"(5) in the case of an architectural work embodied in a building, such building is erected in a country adhering to the Berne Convention.".

**SEC. 203. SUBJECT MATTER OF COPYRIGHT.**

Section 102(a) of title 17, United States Code, is amended—

(1) in paragraph (6) by striking "and" after the semicolon;

(2) in paragraph (7) by striking the period and inserting "; and"; and

(3) by adding after paragraph (7) the following: "(8) architectural works.".

**SEC. 204. SCOPE OF EXCLUSIVE RIGHTS IN ARCHITECTURAL WORKS.**

(a) IN GENERAL.—Chapter 1 of title 17, United States Code, is amended by adding at the end of the following:

### "§ 120. Scope of exclusive rights in architectural works

"(a) PICTORIAL REPRESENTATIONS PERMITTED.—The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.

"(b) ALTERATIONS TO AND DESTRUCTION OF BUILDINGS.—Notwithstanding the provisions of section 106(2), the owners of a building embodying an architectural work may, without the consent of the author or copyright owner of the architectural work, make or authorize the making of alterations to such building, and destroy or authorize the destruction of such building.".

(b) CONFORMING AMENDMENTS.—(1) The table of sections at the beginning of chapter 1 of title 17, United States Code, is amended by adding at the end of the following:

"120. Scope of exclusive rights in architectural works.".

(2) Section 106 of title 17, United States Code, is amended by striking "119" and inserting "120".

4

SEC. 205. PREEMPTION.

Section 301(b) of title 17, United States Code, is amended—
(1) in paragraph (2) by striking "or" after the semicolon;
(2) in paragraph (3) by striking the period and inserting "; or"; and
(3) by adding after paragraph (3) the following:
"(4) State and local landmarks, historic preservation, zoning, or building codes, relating to architectural works protected under section 102(a)(8).".

SEC. 206. EFFECTIVE DATE.

the amendments made by this title apply to—
(1) any architectural work created on or after the date of the enactment of this Act; and
(2) any architectural work that, on the date of the enactment of this Act, is unconstructed and embodied in unpublished plans or drawings, except that protection for such architectural work under title 17, United States Code, by virtue of the amendments made by this title, shall terminate on December 31, 2002, unless the work is constructed by that date.

### EXPLANATION OF AMENDMENT

Inasmuch as H.R. 5498 was ordred reported with a single amendment in the nature of a substitute, the contents of this report constitute an explanation of that amendment.

### SUMMARY AND PURPOSE

H.R. 5498 manifests two distinct purposes in its amendments to the Copyright Act.

First, Title I represents a narrowly drafted exception to the first sale doctrine of copyright law by prohibiting direct or indirect commercial rental of computer software. Provisions have been included to permit lending by nonprofit libraries and education institutions, rental of machines or products embodying computer programs, and rental of electronic audiovisual games used in connection with limited purpose computers. Title I expires on October 1, 1997.

Second, Title II places the United States in full compliance with its multilateral treaty obligations as specified in the Berne Convention for the Protection of Literary and Artistic Works with respect to works of architecture, by creating a new category of copyright subject matter for the constructed design of buildings.

### STATEMENT OF LEGISLATIVE HISTORY

#### TITLE I.—COMPUTER SOFTWARE RENTAL

Computers have become commonplace in government, our homes and offices, and business enterprises. Software—the technology that makes computers work—is of pivotal importance to the United States, which is the world's leader in this unique form of creativity.

Title I of H.R. 5498 relates principally to the rental of computer software and owes its genesis to a bill (H.R. 2740) orginally introduced by Mr. Synar, Mr. Moorhead and several other Members of the Committee (Mr. Fish, Mr. Hughes, Mr. Glickman, Mr. Frank, Mr. Berman, Mr. Bryant, Mr. Sangmeister, and Mr. Levine of California).

The bill was not drafted on a clean legal slate. In 1980 Congress amended the Copyright Act to provide a definition of computer program, and at the same time adding certain limitations on computer

5

copyright owners' rights to protect the public interest. In 1984 Congress passed legislation drafted by this subcommittee that created a freestanding—or sui generis—protection of ten-years duration for mask works. In that same year, Congress prohibited direct or indirect rental of phonorecords.

Earlier in the 101st Congress, the Committee—acting through the Subcommittee—held two days of oversight hearings on computers and intellectual property.[1] Testimony was received from a diverse group of witnesses with expertise on the subject. Several of the witnesses were questioned about computer software rental.

On May 1, 1990, companion legislation passed the United States Senate in the form of S. 198.[2]

On July 30, 1990, the Subcommittee held a legislative hearing on computer software and first sale reform.[3] Testimony was presented by the Register of Copyrights (Ralph Oman), the Software Rental Coalition (R. Duff Thompson), UNISYS Corporation (Robert S. Bramson), EDUCOM (Professor Frank Connolly), Mediagenic, Inc., a video game manufacturer (Bruce L. Davis), the Video Software Dealers Association (Thomas W. Carton), and the American Operators for Equal Treatment (William A. Beckham). Written statements were submitted by the Administration, the American Amusement Machine Association (AAMA), the Amusement and Music Operators Association (AMOA), the American Council on Education, and Hertz Corporation, among others.

On August 3, 1990, the Chairman of the Subcommitte (Mr. Kastenmeier), joined by two cosponsors (Mr. Synar and Mr. Moorhead), introduced an omnibus copyright reform measure (H.R. 5498) which included three Titles: (I) computer software rental reform; (II) "fair use" reform; and (III) architectural works copyright protection.

On September 14, 1990, the Subcommittee marked up H.R. 5498 and, a quorum of Members being present, ordered the bill favorably reported to the full Committee by voice vote with no objections being heard. Two amendments were adopted, the first being a substitute amendment relating to computer software rental offered by Mr. Synar (on behalf of himself and Chairman Kastenmeier). The second, offered by Mr. Kastenmeier, deleted Title II ("fair use") from the bill. Pursuant to motion, the two amendments were incorporated in an amendment in the nature of a substitute.

### TITLE II.—ARCHITECTURAL WORKS

Architecture is a form of artistic expression that performs a significant societal purpose, domestically and internationally.

The 100th Congress passed legislation (Public Law 100–568), enabling the U.S. to meet the requirements of the Berne Convention for the Protection of Literary and Artistic Works. As a result of

---

[1] See Computers and Intellectual Property—Oversight: Hearings Before the Subcomm. On Courts, Intellectual Property, and the Administration of Justice of the House Comm. on the Judiciary, 101st Cong., 1st & 2d Sess. (1989-90) [hereinafter "Oversight Hearings"].

[2] See S. Rep. No. 101–265, 101st Cong., 2d Sess. (1990). See also, 136 Cong. Rec. S5533 (daily ed., May 1, 1990) (remarks of Senator Orrin Hatch, explaining Senate floor amendments).

[3] See Computer Software Rental Amendments Act (H.R. 2740, H.R. 5297, and S. 198): Hearing Before the Subcomm. on Courts, Intellectual Property, and the Administration of Justice of the House Comm. on the Judiciary, 101st Cong., 2d Sess. (1989) [hereinafter "Software Rental Hearing"].

6

this legislation and Senate ratification of the Berne Treaty, on March 1, 1989, the U.S. became a signatory to the world's most important copyright convention. As part of the effort to make U.S. law compatible with Berne standards, Congress noted that the protectible subject matter enumerated in Article 2(1) of the treaty includes "works of architecture."

In the wake of Berne adherence, Chairman Robert W. Kastenmeier (Chairman of the Subcommittee on Courts, Intellectual Property, and the Administration of Justice) asked the Copyright Office to conduct a study of the architectural works protection issue. In response, Register of Copyrights, Ralph Oman, presented a report of the Copyright Office study to Chairman Kastenmeier at a June 19, 1989, press conference in the Madison Building of the Library of Congress. The report concluded that while architectural blueprints, plans, drawings, and models relating to works of architecture are adequately protected by U.S. copyright law, the adequacy of protection under Berne Convention standards for the constructed design of architectural structures remains in doubt.

During the 101st Congress, two bills were introduced by Chairman Kastenmeier to address the Register's concerns: H.R. 3990 (the "Architectural Works Copyright Protection Act of 1990"); and H.R. 3991 (the "Unique Architectural Structures Copyright Act of 1990").

On March 14, 1990, the Subcommittee held a legislative hearing during which testimony was received from the following witnesses: a well-known American architect (Michael Graves, FAIA); the Register of Copyrights (Ralph Oman); an Administration witness (Honorable Jeffrey M. Samuels); the American Institute of Architects (David A. Daileda, AIA); and The Frank Lloyd Wright Foundation (Richard Carney, Managing Trustee, Chief Executive Officer). Written statements were received from the American Consulting Engineers Council and the American Society of Magazine Photographers.[4]

Following this hearing, on August 3, 1990, Mr. Kastenmeier, joined by Mr. Synar and Mr. Moorhead, introduced revised provisions protecting architectural works as Title III of H.R. 5498, the omnibus copyright reform measure referred to above. In this form, the proposal was marked up by the Subcommittee on September 14, 1990, and a quorum of Members being present, ordered the bill favorably reported to the full Committee by voice with no objections being heard.[5]

## COMMITTEE ACTION AND VOTE

On September 18, 1990, the full Committee considered H.R. 5498. An amendment was offered (by Mr. Hyde) to delete section 103 relating to the public display of electronic video games. After debate, the amendment was defeated by voice vote. After adoption of the

4 See Hearing on Architectural Design Protection Before the Subcomm. on Courts, Intellectual Property, and the Administration of Justice of the House Comm. on the Judiciary, 101st Cong. 2d Sess. (1990) [hereinafter referred to as "Architectural Design Hearings"].
5 With the deletion of fair use reform from H.R. 5498, architectural works protection, formerly Title III, became Title II.

7

Subcommittee substitute amendment, the Committee ordered the bill favorably reported by voice vote with a quorum present.

## DISCUSSION

### TITLE I.—COMPUTER SOFTWARE RENTAL

One of the most important limitations on copyright owners' exclusive rights is embodied in section 109 of title 17, United States Code. This section incorporates the so-called "first sale" doctrine. Under this doctrine, the owner of a lawfully made copy of a work is entitled to sell or otherwise dispose of that copy and to display the copy publicly without obtaining the copyright owner's permission. For example, a student who purchases anthology of poetry for literature class may sell that copy to a secondhand book store, which may in turn sell the copy to the public. A grocery store may purchase copies of video cassettes and rent those copies to its customers. A museum may display a painting it purchases from an art dealer.

Section 109(a) of title 17, United States Code, is structured as an exception to the copyright owner's section 106(3) right of distribution. Section 109(b) of title 17, United States Code, is structured as an exception to the copyright owner's section 106(5) public display right. These sections do not act as a limitation on the other exclusive rights granted copyright owners in section 106, title 17, United States Code. For example, an owner of a lawfully made copy may not, without the permission of the copyright owner (or availability of a statutory defense) [6] reproduce copies of the work, prepare derivative works, or publicly perform the work.

The first sale doctrine represents an important balancing of interests. The doctrine prohibits copyright owners from controlling the terms and conditions of further distribution of lawfully made copies of a work once the initial authorized distribution of those copies has taken place. At the same time, the limitations on the doctrine preserve other, essential rights of copyright owners, including the right to authorize public performances. Congress has, in the past, resisted proposals to alter the balance achieved in section 109, requiring those seeking amendments to make a compelling case for change. Proposals to reform the first sale doctrine are neither easy nor without controversy. They occur in a shifting legal, technological and economic landscape.

Frequently, calls to amend the first sale doctrine are made in response to a new technology developed for reproduction of copyrighted works. Even though the 1976 Copyright Act was carefully drafted to be flexible enough to be applied to future innovations, technology has a habit of outstripping even the most flexible statutes. Copyright is, in large part, a response to new technology. Yet, technology has been both a boon and a bane to authors: a boon because it has fostered new methods of creation and distribution; a bane because it has also resulted in inexpensive, easy, and quick ways to reproduce copyrighted works, in many cases in private or semi-private environments that render detection all but impossible.

---

[6] In the case of computer programs, a special exemption is provided in section 117, title 17, United States Code, for the making of back-up and archival copies.

8

In 1984, Congress was presented with evidence demonstrating that the nascent record rental business posed a genuine threat to the record industry. Copies of phonorecords were being rented at a fraction of their cost, in conjunction with advertisements exhorting customers to "never buy another record." Congress responded by prohibiting the rental of phonorecords for purposes of direct or indirect commercial advantage.[7]

Congress has now been presented with similar evidence by the computer software industry. Indeed, in some respects, the evidence is even more compelling in the case of software.[8] The price disparity between the sale and rental prices is greater than the case with phonorecords: software selling for $495 has been rented for $35. And, unlike phonorecords, which are an entertainment product, software is typically a utilitarian product. Short term rental of software is, under most circumstances, inconsistent with the purposes for which software is intended. Rental of software will, most likely, encourage unauthorized copying, deprive copyright owners of a return on investment, and thereby discourage creation of new products.[9]

At this point in time, the number of businesses renting only software is small. Legislation barring rental for purposes of direct or indirect commercial advantage will not, therefore, harm entrenched interests. The Committee does not wish, however, to prohibit nonprofit lending by nonprofit libraries and nonprofit educational institutions. Such institutions serve a valuable public purpose by making computer software available to students who would not otherwise have access to it.[10] At the same time, the Committee is aware that the same economic factors that lead to unauthorized copying in a commercial context may lead library patrons also to engage in such conduct. Therefore, the bill requires that all copies of software lent by nonprofit libraries bear a notice warning borrowers that unauthorized copying may violate the copyright laws. The text of the notice is to be prescribed by the Register of Copyrights.

Title I, which is drafted narrowly, does not bar the rental (after first sale) of two important categories of software. First, it does not prohibit the rental, lease, or lending of consumer and other products containing computer programs. Automobiles, calculators, and other electronic consumer products contain computer programs, buy these computer programs cannot now be copied by consumers during the ordinary operation of these products. The touchstone of the exemption is rental for the purpose of using the machine or products, and not rental in order to copy the computer program embodied in the machine or product.

Second, although there is a substantial rental market for electronic audiovisual games played on limited purpose computers, such computer are generally used solely for the playing of these

---

[7] This legislation was sunsetted after five years. PUB. L. NO. 98-450, 98 Stat. 1727 (1984). In 1988, the legislation was renewed, with expiration set for October 1, 1997. PUB. L. NO. 100-617, 102 Stat. 3194 (1988). The rights granted under Title I of H.R. 5498 are set to expire on that same date.

[8] See Software Rental Hearing, supra note 3 (statement of Ralph Oman).

[9] Id. (statement of R. Duff Thompson).

[10] Id. (statement of Frank W. Connolly).

9

games and not used to copy the computer programs that generate the game.[11] The Committee is also aware that some of those computers may be designed for other purposes[12] not involving the playing of electronic audiovisual games. So long as these other purposes do not involve the copying of computer programs, these computers are exempt under new clause (ii) of section 109(b)(1)(B) established by the bill.

The Committee has also been made aware of an anomaly in existing copyright law that prevents certain coin-operated equipment from being used for their intended purpose. In *Red-Baron Franklin Park, Inc.* v. *Taito Corp.*,[13] a Japanese manufacturer of electronic audiovisual games conceded that the first sale provisions of section 109(a) of the Copyright Act permitted a U.S. arcade game operator to purchase, in Japan, a circuit board containing the game and to then import the circuit board for insertion into a coin-operated arcade game in the United States. The manufacturer, though, argued—and the court of appeals agreed—that the first sale doctrine does not act as a limitation on the public performance right. The court acknowledged that the circuit boards "have utility only in the hands of someone who plans to exploit them commercially."[14] Nevertheless, the court held that the plain words of the statute dictated a finding of infringement.

The Committee received testimony demonstrating that some of the most popular electronic audiovisual games are marketed only as so-called "dedicated games": units consisting of a printed circuit board containing the game, plus a wooden cabinet containing a tv monitor, power supply, coin-acceptor mechanism, and many other parts. Dedicated games sell for approximately $2,500 compared with a cost of less than $1,000 for the printed circuit board alone.[15]

In order to rectify the anomaly in the Copyright Act that permits copyright owners of electronic audiovisual games designed for use in coin-operated equipment to sell printed circuit boards containing the games and then turn around and successfully sue to prevent use of the circuit boards for their intended purpose, the bill provides that the public performance right will not apply in the following very limited circumstances: where, in the case of electronic audiovisual games intended for use in coin-operated equipment, a lawfully made copy of such game has been purchased and is used in such equipment. This provision does not apply to any work of authorship embodied in an electronic audiovisual game if the copyright owner of the electronic audiovisual game is not also the copyright owner of that other work of authorship. For example, before including a popular copyrighted song in an electronic audiovisual game, permission of the copyright owner (or his or her licensee) would be required to reproduce the song in the game and to publicly perform the song through operation of the game.

---

[11] Id. (statement of Thomas W. Carton, Jr.).
[12] The phrase "may be designed for other purposes," as contained in new clause (ii) of section 109(b)(1)(B) is intended to refer to other limited uses and would not apply to a computer program embodied or used in conjunction with a general purpose computer that is also capable of being used to play video games.
[13] 883 F.2d 275 (4th Cir. 1989), cert. denied, 110 S.Ct. 869 (1990).
[14] 883 F.2d at 279.
[15] See Computer Rental Hearings, supra note 3 (statement of William Beckham).

10

The Committee approaches proposed exceptions to the public performance right with great concern, since the right forms the backbone of the motion picture, musical, and theatrical industries. Any proposal adversely affecting these industries would be met with strong opposition and disfavor, and would call into question a host of international issues, including possible conflict with our country's obligations under the Berne Convention. The Committee is convinced, however, that this amendment is drafted in a way that carefully addresses the narrow issue presented in the *Red-Baron* decision. Protective language has been included to ensure that the right of public performance is left otherwise unaffected by the amendment.

Another issue carefully considered by the Committee—again through the Subcommittee—was the effective date provisions found in section 104 of Title I of H.R. 5498. Section 104 specifies the prospective application of the bill by stating that persons who acquire lawfully made copies of computer programs before the date of enactment of this bill may dispose of the possession of those copies on or after the date of enactment in any manner permitted by section 109, title 17, United States Code, as in effect on the day before the date of enactment.

Previous versions of the proposed legislation applied to rentals of all existing programs and raised serious constitutional questions. As aptly observed by a representative of the Administration, retroactivity "could raise a serious question under the "Just Compensation Clause" of the 5th Amendment to the Constitution by depriving prior purchasers of a right vested under existing law without compensating them for the loss." [16] The Committee agreed and made the proposed legislative prospective in scope only.

Another "effective date" provision contains a legislative sunset, providing that the amendments made by section 102 of the bill expire on October 1, 1997, the same date that the record rental provisons of section 109, title 17, United States Code, are scheduled to expire.

### TITLE II.—ARCHITECTURAL WORKS

The Architectural Works Protection Act of 1990 is result of United States adherence to the Berne Convention for the Protection of Literary and Artistic Works. [17] The Convention is the world's most important copyright treaty. Adherence of the United States to the Berne Union was a two-step process. First, implementing legislation had to be drafted, refined, and enacted. The implementing legislation had one simple, but important objective: to make only those changes in domestic U.S. law required to place the United States in compliance with our treaty obligations. The second step, reached only after the first was completed, required the Senate to give its advice and consent to the treaty. Both steps reached fruition on October 31, 1988, when President, Reagan signed into law H.R. 4262 [18] (the Berne Implementation Act of

---

[16] id. (written statement of Harry F. Manbeck, Jr.).
[17] For further background about the proposed legislation, see 136 Cong. Rec. E259 (daily ed. Feb. 7, 1990) (introductory remarks of Robert W. Kastenmeier); Architectural Design Hearings, supra note 4.
[18] Public Law 100–568, 102 Stat. 2853.

1988) and the treaty. Both were effective on March 1, 1989, when the United States became a full-fledged member of the Berne Union.

Article 2(1) of the Berne Convention requires member countries to provide copyright for "works of architecture"—the constructed design of buildings. This category of subject matter is distinct from "illustrations, plans, sketches and three-dimensional works relative to architecture," which are also required to be protected under Article 2(1). The current U.S. Copyright Act expressly includes "diagrams, models, and technical drawings, including architectural plans" as a species of protected "pictorial, graphic, and sculptural work." [19] It does not, however, expressly protect "works of architecture," although this Committee's Report accompanying the 1976 Copyright Act contemplated that at least selected works of architecture—those containing elements physically or conceptually separable from their utilitarian function—would be protected to the extent of their separability. [20]

Due to the lack of express statutory protection for works of architecture in the 1976 Copyright Act, the original Berne implementing bills included provisions according such protection, limited by exemptions and restrictions on remedies necessary to protect the public as well as the interests of the real estate industry. [21]

During the initial deliberations on Berne adherence in 1986 and 1987, the issue of protection for works of architecture failed to draw much response. Then, in 1988, near the end of the hearing process, two respected copyright scholars testified that creation of a separate statutory provision for works of architecture might not be required for compliance with our obligations under the Berne Convention. This testimony was based on language in this Committee's Report accompanying the 1976 Copyright Act. [22] These experts suggested that the issue be studied further before undertaking legislative action.

Relying on this testimony, the provisions on works of architecture were dropped from the Berne implementing legislation. Agreeing with the experts' suggestions for further study, Chairman Robert W. Kastenmeier of the Subcommittee on Courts, Intellectual Property, and the Administration of Justice, by letter of April 27, 1988, to Register of Copyrights Ralph Oman, requested that the Copyright Office undertake a full review of the subject and report

[19] The reference to "architectural plans" was added by the Berne Convention Implementation Act of 1988. Id. Committee reports accompanying the 1976 Copyright Act indicated that such works were protected under that Act. Indeed, the Copyright Office registered architectural plans and drawings under the 1909 Copyright Act. See generally, "Copyright in Works of Architecture: A Report of the Register of Copyrights" (June 1989), Chapter 4.

[20] H. Rept. No. 94–1476, 94th Cong., 2d ses. 55 (1976).

[21] H.R. 1623, 100th Cong., 1st Sess. (1987) (Kastenmeier); H.R. 2962, 100th Cong., 1st Sess. (1987) (Moorhead, on behalf of the Administration). See also S. 2904, 99th Cong., 2d Sess. (1986) (Mathias); S. 1301, 100th Cong., 1st Sess. (1987) (Leahy); S. 1971, 100th Cong., 1st Sess. (1987) (Hatch, on behalf of the Administration). H.R. 1623 and S. 1301 would have limited protection to architectural works having "an original artistic character." The other bills did not contain this limitation.

[22] Berne Convention Implementation Act of 1987: Hearings on H.R. 1623 Before the Subcomm. on Courts, Civil Liberties and the Administration of Justice of the House Comm. on the Judiciary, 100th Cong., 1st & 2d Sess. 679–680 (statement of Prof. Paul Goldstein); 689 (statement of former Register of Copyrights Barbara Ringer) (1987 & 1988) (citing H. Rept. No. 94–1476, 94th Cong., 2d sess. 55 (1976)).

12

to him the results of the study, including any recommendations for amending the Copyright Act.

On June 19, 1989, Mr. Oman delivered his report to Chairman Kastenmeier.[23] While the Register noted the strong professional disagreement within the Copyright Office over the existence of copyright for the design of works of architecture under the 1976 Act, he concluded, and the entire staff concurred, that the Berne Convention required such protection. Accordingly, on February 7, 1990, Chairman Kastenmeier introduced H.R. 3990, to place the United States unequivocally in compliance with its Berne obligations. For purposes of discussion, Chairman Kastenmeier also introduced H.R. 3991, the "Unique Architectural Structures Copyright Act of 1990." H.R. 3991 sought to protect only works possessing a "unique artistic character." Following a legislative hearing before the Subcommittee on March 14, 1990, revised provisions protecting architectural works, based on H.R. 3990, were introduced as part of H.R. 5498. These provisions now form Title II of H.R. 5498.

The importance of H.R. 3990 (and Title II of H.R. 5498) should not be measured solely by the purpose of placing the United States unequivocally in compliance with its Berne Convention obligations. All copyright legislation is premised on Article I, section 8, clause 8 of the Constitution, which grants Congress the power to protect the "writings" of authors in order to "promote the progress of science." The proposed legislation must (and the Committee believes does) further this constitutional goal. Architecture plays a central role in our daily lives, not only as a form of shelter or as an investment, but also as a work of art. It is an art form that performs a very public, social purpose. As Winston Churchill is reputed to have once remarked: "We shape our buildings and our buildings shape us." We rarely appreciate works of architecture alone, but instead typically view them in conjunction with other structures and the environment at large, where, at their best, they serve to express the goals and aspirations of the entire community. Frank Lloyd Wright aptly observed: "Buildings will always remain the most valuable aspect in a people's environment, the one most capable of cultural reaction." [24]

The truth of this observation is borne out every day in the Capitol, which serves as a strong symbol of our country's dedication to democracy. The sheer number of visitors to the Capitol speaks eloquently to the success of that symbol. Indeed, the important relationship between democracy and architecture was well understood by our Founding Fathers. The design of the Capitol was strongly influenced by Thomas Jefferson, whose love of architecture is well known and visible today in his own works of architecture at Monticello and the University of Virginia.

Architecture is not unlike poetry, a point made by renowned critic Ada Louise Huxtable, who wrote that architects can make "poetry out of visual devices, as a writer uses literary or aural devices. As words become symbols, so do objects; the architectural

---

[23] "Copyright in Works of Architecture: A Report of the Register of Copyrights" (June 1989).
[24] "F.W. Wright, on Architecture" (1941).

13

world is an endless source of symbols with unique ramifications in time and space." [25]

In short, the Committee concluded that the design of a work of architecture is a "writing" under the Constitution and fully deserves protection under the Copyright Act. Protection for works of architecture should stimulate excellence in design, thereby enriching our public environment in keeping with the constitutional goal.

The Committee has carefully considered whether injunctive relief should be available for infringement of architectural works, and if so, under what conditions. Section 4 of H.R. 3990 contained a provision limiting injunctive relief against allegedly infringing buildings to circumstances where construction has not "substantially begun." Michael Graves, in his written statement to the Subcommittee argued:

> Categorically denying the copyright holder an injunction after construction has substantially begun does not lessen the resulting loss to the owner [of the building]. For example, approximately eighty percent of the architect's fees has normally been earned before construction begins. In addition, before the commencement of construction, an owner typically spends large sums of money for land, surveys, engineering fees, carrying costs, fees in connection with zoning approvals, and legal fees. [26]

The American Institute of Architects similarly argued:

> Generally, we are *not* in favor of the destruction of useful buildings, and we fully expect a court would require a strong showing from a copyright owner before ordering such drastic action. On the other hand, it is not at all inconceivable that a situation could arise where the very existence of an infringing structure is an irreparable injury to the copyright owner. In that case, the courts should not be precluded from ordering a halt to construction, [or] a substantial alteration so as to make the building not infringing, or even to tear the building down if the evidence properly supports that conclusion. We are confident that the courts will appropriately weigh the public policy concerns about economic waste against the interests of the copyright owner. [27]

H.R. 3990 proceeded on the assumption that injunctions against allegedly infringing buildings embodying protected architectural works may present issues different than other forms of authorship. Architectural works are the only form of copyrightable subject matter that is habitable. Large scale architectural projects involve an almost bewildering number of state and local permit processes that must be navigated, and typically involve a considerable number of interests in addition to the architect and client, includ-

---

[25] A. Rossi, "Memory and Metaphor in Architecture Anyone?" at 45–46 (1986). See also Architectural Design Hearings, *supra* note 4, at 136 (statement of Frank Lloyd Wright Foundation): "Architectural art is no less art than its counterparts in the world of sculpture and painting * * *"; id. at 49 (statement of Register of Copyrights Ralph Oman): "[Architecture is] one of the oldest and most revered forms of Art."

[26] Architectural Design Hearings, *supra* note 4, at 18–19.

[27] *Id.* at 117.

14

ing lending institutions, contractors, subcontractors, unions, and suppliers.

Nevertheless, it ultimately was concluded that these differences were not substantial enough to justify the limitations found in H.R. 3990 as introduced.[28] As a practical matter, buildings embodying protected architectural works must be expressed in plans deposited with and approved by local planning commissions before construction can begin. A copyright owner who is unsure whether a completed structure will infringe his or her protected architectural work can review these plans and gain valuable information in making such a judgment. Thus, in many cases costly delays necessitated by uncertainties over the ultimate design may be avoided.

Title II therefore does not contain the limitation on injunctive relief contained in H.R. 3990, as introduced. Injunctive relief for alleged infringement of architectural works will be governed by the general principles applicable to all categories of subject matter,[29] taking into account the complexities and different affected interests described above.

Those general principles are expressed first in Rule 65, Federal Rules of Civil Procedure (the provisions of which are applicable to copyright infringement actions), and second in the standards for injunctive relief developed by the Federal judiciary. The Committee is aware that various courts have developed different standards for injunctive relief, or at least enunciated the general principles for injunctive relief in different ways. Nevertheless, all would agree, and the Committee believes, that "equitable considerations, in this as in all fields of law, are pertinent to the appropriateness of injunctive relief. The public interest is always a relevant consideration for a court in deciding whether to issue an injunction."[30]

One equitable doctrine that may have particular relevance in suits to enjoin allegedly infringing architectural works is laches. The AIA noted in its statement that copyright owners may have to make a strong showing of entitlement to remedial relief in cases where an allegedly infringing structure has been substantially begun or completed.[31] The Committee agrees and therefore expects that injunctions will be sparingly used in such cases, but does not with to preclude such relief in appropriate circumstances.

As a counterbalance to the injunctive relief authority of copyright holders, the owners of buildings are granted the flexibility to alter or modify the structures they own, or even to demolish them.[32] H.R. 3990, as introduced, contained a limitation on the right to alter a building containing a protected architectural work.

---

[28] For example, the production of motion pictures also involves many of the complications discussed above with respect to architectural works. The Committee is unaware of any complaints from the motion picture industry over injunctions.

[29] See 17 U.S.C. section 502.

[30] *New Era Pubs. Aps. Int'l* v. *Henry Holt & Co.*, 884 F.2d 659, 663 (2d Cir. 1989) (denying pet. for reh'g en banc), cert. denied, 58 U.S.L.W. 3528 (U.S. Feb. 20, 1990) (Newman, J., dissenting). See also id. at 661: "All now agree that injunction is not the automatic consequence of infringement and that equitable considerations always are germane to the determination of whether an injunction is appropriate." (Miner, J., concurring.)

[31] Id.

[32] Id. (statement of Jeffrey M. Samuels).

15

SECTION-BY-SECTION ANALYSIS

*Section 1.—Short Title*

Section 1 provides that the bill may be referred to as the "Copyright Amendments Act of 1990."

TITLE I.—COMPUTER SOFTWARE

*Section 101.—Short Title*

This section provides that this may be cited as the "Computer Software Rental Amendment Act 1990."

*Section 102.—Rental of Computer Programs*

Section 102 amends section 109(b) of title 17, United States Code, by redesignating paragraphs (2) and (3) as paragraphs (3) and (4), by replacing existing paragraph (b)(1) with a new paragraph, and by replacing redesignated paragraph (4) with a new paragraph.

New subparagraph (b)(1)(A) expands the limited exception to the first sale doctrine Congress made with respect to phonorecords in 1984 (renewed in 1988) to include, as specified, computer programs. As with phonorecords, on or after the date of enactment of this bill, computer programs may not, for purposes of direct or indirect commercial advantage, be rented leased, or lent. An exemption for the rental, lease, or lending for nonprofit purposes by nonprofit libraries and nonprofit educational institutions is provided. Additionally, the bill states that the transfer of possession of a lawfully made copy of a computer program by one nonprofit educational insititution to another or to faculty, staff, or students is also exempt.

Nonprofit libraries are required to affix on the packaging containing the computer program a warning of copyright, in accordance with requirements the Register of Copyrights shall prescribe by regulation.[33] New subparagraph 109(b)(2)(B) of title 17, United States Code, established under the bill, requires the Register of Copyrights, not later than three years from the date of enactment, and such times thereafter as the Register considers appropriate, to submit to Congress a report stating whether the provisions of the bill have served their intended purpose of maintaining the integrity of the copyright system, while still providing nonprofit libraries the capacity to fulfill their function.

New clause 109(b)(1)(B)(i) of title 17, United States Code, established under the bill, broadly states that the rights granted in new subparagraph 109(b)(1)(A) do not apply to a computer program that is embodied in a machine or product and that cannot be copied during the ordinary operation or use of the machine or product. This provision recognizes that many consumer products contain computer programs, including automobiles, calculators, and microwave ovens. Computer programs are typically embodied in electronic circuitry embedded in these products, and cannot be copied by consumers during the ordinary operation or use of the product.

New clause 109(b)(1)(B)(ii) of title 17, United States Code, established under the bill, addresses the special case of limited purpose computers designed for playing electronic audiovisual games. Com-

---

[33] See new subparagraph 109(b)(2)(A).

16

puter programs embodied in these games presently cannot be copied while playing the game. The Committee is aware that some limited purpose computers used for playing electronic audiovisual games may be used for additional purposes that also do not involve the copying of computer programs. These computers are also encompassed within clause 109(b)(1)(B)(ii) as well.

The final paragraph of section 102 of H.R. 5498 provides that, as with phonorecord rental, an infringer of the rights granted under the bill is liable for injunctive relief and monetary damages, but is not subject to the criminal penalties set forth in section 506 of title 17, United States Code, or section 2319 of title 18, United States Code.

### Section 103.—Public Display of Electronic Video Games

Section 103 of the bill addresses the anomaly created by the *Red-Baron Franklin Park, Inc.* v. *Taito Corp.* decision.[34] Under the bill, the owner of a particularly lawfully made copy of an electronic audiovisual game intended for use in coin-operated equipment, is entitled, without the permission of the copyright owner of the electronic audiovisual game, to publicly perform or publicly display that electronic audiovisual game in coin-operated equipment. The exception does not apply, however, in cases where the electronic audiovisual game also contains other works of authorship, such as a musical composition or motion picture, unless the copyright owner of the electronic audiovisual game is also the copyright owner of these works as well. The term "copyright owner" has the meaning as defined in section 101, title 17, United States Code.

### Section 104.—Effective Date

This section of the bill contains three provisions dealing, respectively, with the general effective date, prospective application, and termination of rights.

Subsection (a) of the section provides that, subject to subsection (b), the amendments made by this title shall take effect on the date of enactment. Subsection (b) further clarifies that persons who acquired lawfully made copies of a computer program before the date of enactment may dispose of those copies on or after the date of enactment in any manner permitted by section 109 of title 17, United States Code, as in effect on the day before the date of enactment. Subsection (c) provides that the rights granted in section 102 of the bill shall terminate on October 1, 1997.

### Section 105.—Recordation of Shareware

Section 105 of the bill—which is uncodified—authorizes the Register of Copyrights to record documents relating to shareware, to maintain current, separate records relating to such documents, and to publish at periodic intervals information relating to such recordations. The purpose of section 105 is to encourage individuals desiring to permit unrestricted, or liberal, use of software they create, to file documents to that effect with the Copyright Office so that an effective public record will be available.

---

[34] 883 F.2d 275 (4th Cir. 1989), cert. denied, 110 S.Ct. 869 (1990). See analysis of this case, supra, in the Discussion section of this Report.

17

Subsection (a) authorizes the Register, upon receipt of a document designated as pertaining to computer shareware, to record the document and return it with a certificate of recordation. Such a document could include license agreements and statements that the author attaches conditions to the use or distribution of a computer program. Documents would be recorded under the fee structure in effect for other documents relating to copyright.

For purposes of this section, shareware is computer software which meets the standard of originality in the Copyright Act but for which the author sets certain conditions for its use and distribution. The Committee is aware that the terms "computer shareware" and "public domain computer shareware" are not found in the Copyright Act, and are susceptible of different meanings in the computer and legal communities. It is apparent that there is a lack of a central clearinghouse for information about shareware, and that such a clearinghouse would aid in wider dissemination of such works. The Register is given wide latitude to promulgate practices and procedures that fulfill the purposes of this section and also to obtain information—prior to the "sunset" of this Title—about an important manifestation of the creative computer community. Because of the different interpretations of the term shareware in the computer industry, it will be left up to the individual author submitting the document to designate it as pertaining to shareware. Failure to so designate the document will result in the document being recorded with the general copyright records. Computer shareware does not include electronic data bases, or other works of authorship.

Subsection (b) provides the Register with authority to maintain current, separate records relating to the recordation of documents and to compile and publish at periodic intervals information relating to such recordations. Such publications shall be offered to the public at prices based on the cost of reproduction and distribution.

In order to facilitate access to shareware, Title I of H.R. 5498 provides, in subsection (c) of section 105, that any individual recording a document pertaining to shareware may also deposit two copies of the shareware as embodied in machine-readable form for the benefit of the Library of Congress' Machine-Readable Reading Room. The nature of the deposit is to be determined by the definition of "best edition" contained in section 101 of title 17, United States Code. Subsection (c) does not affect the mandatory deposit requirements of section 407 of title 17, United States Code, for computer software that is subject to copyright.

Subsection (d) authorizes the Register to establish regulations in conformity with law for the administration of the functions of the Copyright Office. All regulations are subject to the approval of the Librarian of Congress.

### TITLE II.—ARCHITECTURAL WORKS

*Section 201.—Short Title*

This section provides that this title may be cited as the "Architectural Works Copyright Protection Act of 1990."

18

*Section 202.—Definitions*

Section 202 adds a new definition ("architectural work") to the Copyright Act and amends an existing definition ("Berne Convention work").

Subsection (a) amends section 101 of title 17, United States Code, to provide a definition of the subject matter protected by the bill, "architectural works." An "architectural work" is defined as "the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings." The work includes "the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features."

The definition has two components. First, it states what is protected. Second, it specifies the material objects in which the architectural work may be embodied. The protected work in the design of a building. The term "design" includes the overall form as well as the arrangement and composition of spaces and elements in the design. The phrase "arrangement and composition of spaces and elements" recognizes that: (1) creativity in architecture frequently takes the form of a selection, coordination, or arrangement of unprotectible elements into an original, protectible whole; (2) an architect may incorporate new, protectible design elements into otherwise standard, unprotectible building features; and (3) interior architecture may be protected.

Consistent with other provisons of the Copyright Act and Copyright Office regultions,[35] the definition makes clear that protection does not extend to individual standard features, such as common windows, doors, and other staple building components. A grant of exclusive rights in such features would impede, rather than promote, the progress of architectural innovation. The provision is not, however, intended to exlude from the copyright in the architectural work any individual features that reflect the erchitect's [36] creativity.

Critic Ada Louise Huxtable once provided the following comment that may be helpful as an expression of the policy behind the legislation:

> [T]echnology is not art, and form only follows function as a starting point, or life and art would be much simpler than they are. The key to the art of architecture is the conviction and sensitivity with which technology and function are interpreted aesthetically, in solutions of a practical social purpose.[37]

Architect Michael Graves, a witness before the Subcommittee, provided further guidance in an essay entitled "A Case for Figurative Architecture." Mr. Graves explained his design efforts by describing two types of architectural language, "internal" and "poetic." Internal language is "intrinsic to building in its most

---

[35] See 17 U.S.C. § 102(b) (1978); 37 CFR 202.1.

[36] Protection is not limited to architects. Any individual creating an architectural work is entitled to exercise the exclusive rights, granted under the bill, without regard to professional training or state licensing requirements. The general provisions of the Copyright Act governing ownership and transfer of copyrighted works shall apply equally to architectural works.

[37] A.L. Huxtable, "Architecture Anyone?" (1986).

19

basic form—determined by pragmatic, constructional, and techni-
cal requirements." Poetic language is "responsive to issues external
to the building, and incorporates the three-dimensional expression
of the myths and rituals of society." [38] The intent of the legislation
is to protect only what Mr. Graves calls "poetic language."

During the Subcommittee's 1990 hearing, testimony was received
that a potential gap in protection may exist where an architectural
work has been depicted in plans or drawings, but has not yet been
constructed.[39] Since the original definition of architectural work in
H.R. 3990 referred only to architectural works "as embodied in"
buildings, there was concern that a defendant with access to the
plans or drawings could construct an identical building but escape
liability so long as the plans or drawings were not copied.

The Register of Copyrights disagrees that liability could be avoid-
ed in such circumstances, arguing that the witnesses misconstrued
the access prong of infringement analysis. The Register's position,
based on general principles of copyright law, is that where a three-
dimensional work meets the standard for protection, infringement
may lie regardless of whether access to the three-dimensional work
is obtained from a two-dimensional or three-dimensional depiction
thereof.[40]

In order to resolve this debate, subsection 202(a) of title II of H.R.
5498 modifies the definition of architectural work so that a work of
architecture may be embodied in the built design—the constructed
three-dimensional building—or in plans, drawings, or in "any tan-
gible medium of expression," such as a blueprint or computer disk.
Protection for architectural plans, drawings, and models as pictori-
al, graphic, or sculptural works under section 102(a)(5), title 17,
United States Code, is unaffected by this bill.

This change does, however, raise questions regarding the rela-
tionship between copyright in the architectural work and copyright
in plans and drawings. The bill's intention is to keep these two
forms of protection separate. An individual creating an architectur-
al work by depicting that work in plans or drawing will have two
separate copyrights, one in the architectural work (section
102(a)(8)), the other in the plans or drawings (section 102(a)(5)).
Either or both of these copyrights may be infringed and eligible
separately for damages. in cases where it is found that both the ar-
chitectural work and the plans have been infringed, courts or
juries may reduce an award of damages as necessary to avoid
double remuneration, but the basic concept of election of protec-
tion [41] is important and must be preserved.

The Subcommittee made a second amendment in the definition
of architectural work: the deletion of the phrase "or three-dimen-
sional structure." This phrase was included in H.R. 3990 to cover
cases where architectural works embodied in innovative structures

[38] Graves, "Buildings and Projects 1966–1981" at 11 (9182).
[39] This point was eloquently made by Professor Jane C. Ginsburg in a statement submitted to
the Subcommittee. See Architectural Design Hearings, supra note 4, at 184–187.
[40] Id. at 67–68.
[41] The Subcommittee was aware that certain works of authorship which may separately qual-
ify for protection as pictorial, graphic, or sculptural works may be permanently embodied in
architectural works. Stained glass windows are one such example. Election is inappropriate in
any case where the copyright owner of a pictorial, graphic, or sculptural work embodied in an
architectural work is different from the copyright owner of the architectural work.

20

that defy easy classification. Unfortunately, the phrase also could be interpreted as covering interstate highway bridges, cloverleafs, canals, dams, and pedestrian walkways. The Subcommittee examined protection for these works, some of which form important elements of this nation's transportation system, and determined that copyright protection is not necessary to stimulate creativity or prohibit unauthorized reproduction.

The sole purpose of legislating at this time is to place the United States unequivocally in compliance with its Berne Convention obligations. Protection for bridges and related nonhabitable three-dimensional structures is not required by the Berne Convention. Accordingly, the question of copyright protection for these works can be deferred to another day. As a consequence, the phrase "or other three-dimensional structures" was deleted from the definition of architectural work and from all other places in the bill.

This deletion, though, raises more sharply the question of what is meant by the term "building." Obviously, the term encompassed habitable structures such as houses and office buildings. It also covers structures that are used, but not inhabited, by human beings, such as churches, pergolas, gazebos, and garden pavilions.

Subsection (b) amends the definitions of "Berne Convention work" in section 101, title 17, United States Code, to provide a point of attachment for national eligibility purposes. An architectural work is a "Berne Convention work" if the building in which the architectural work is embodied "is erected in a country adhering to the Berne Convention." This amendment is necessitated by United States membership in the Berne Union.

### Section 203.—Subject Matter of Copyright

This provision amends section 102, title 17, United States Code, to create a new category of protected subject matter: "architectural works." By creating a new category of protectible subject matter in new section 102(a)(8), and, therefore, by deliberately not encompassing architectural works as pictorial, graphic, or sculptural works in existing section 102(a)(5), the copyrightability of architectural works shall not be evaluated under the separability test applicable to pictorial, graphic, or sculptural works embodied in useful articles. There is considerable scholarly and judicial disagreement over how to apply the separability test,[42] and the principal reason for not treating architectural works as pictorial, graphic, or sculptural works is to avoid entangling architectural works in this disagreement.[43]

The Committee does not suggest, though, that in evaluating the copyrightability or scope of protection for architectural works, the Copyright Office or the courts should ignore functionality. A two-step analysis is envisioned. First, an architectural work should be examined to determine whether there are original design elements present, including overall shape and interior architecture. If such design elements are present, a second step is reached to examine

---

[42] *See* Perlutter, *"Conceptual Separability and Copyright in the Design of Useful Articles,"* 37 J. Copr. Soc'y 339 (1990) for a helpful review of this issue.

[43] Monumental, nonfunctional works of architecture are currently protected under section 102(a)(5) of title 17 as sculptural works. These works are, nevertheless, architectural works, and as such, will not be protected exclusively under section 102(a)(8).

21

whether the design elements are functionally required. If the design elements are not functionally required, the work is protectible without regard to physical or conceptual separability. As a consequence, contrary to the Committee's report accompanying the 1976 Copyright Act with respect to industrial products,[44] the aesthetically pleasing overall shape of an architectural work could be protected under this bill.[45]

The proper scope of protection for architectural works is distinct from registrability. Functional considerations may, for example, determine only particular design elements. Protection would be denied for the functionally determined elements, but would be available for the nonfunctional determined elements. Under such circumstances, the Copyright Office should issue a certificate of registration, letting the courts determine the scope of protection. In each case, the courts must be free to decide the issue upon the facts presented, free of the separability conundrum presented by the useful articles doctrine applicable for pictorial, graphic, and sculptural works. Evidence that there is more than one method of obtaining a given functional result may be considered in evaluating registrability or the scope of protection.

The proposed legislation incorporates the general standards of originality applicable for all other copyrightable subject matter. This standard "does not include requirements of novelty, ingenuity, or [a]esthetic merit."[46] Subjective determinations of artistic or aesthetic merit are inappropriate and contrary to fundamental principles of copyright law.[47]

As a result of the incorporation of the general standard of originality for architectual works, determinations of infringement of architectual works are to be made according to the same standard applicable to all other forms of protected subject matter. The references in the definition of "architectural work" to "overall form," and to the nonprotectibility of "individual standard features" are not intended to indicate that a higher standard of similarity is required to prove infringement of an architectural work, or that the scope of protection of architectural works is limited to verbatim or near-verbatim copying. These definitional provisions are intended merely to give the courts some guidance regarding the nature of the protected matter. The extent of protection is to be made on an ad hoc basis.

*Section 204.—Scope of Exclusive Rights on Architectural Works*

Section 204 creates a new section 120 of title 17, United States Code, limiting the exclusive rights in architectural works.

Subsection (a) of new section 120 permits the unauthorized "making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily

---

[44] H. Rep. No. 94-1476, 94th Cong., 2d sess. 55 (1976).
[45] Chairman Kastenmeier forcefully made these points in his introductory statement on the House floor, 136 Cong. Rec. E259-60 (daily ed. Feb. 7, 1990).
[46] H. Rept. No. 94-1476, 94th Cong., 2d sess. 51 (1976).
[47] *Bleistein* v. *Donaldson Lithographic Co.*, 188 U.S. 239 (1903).

visible from a public place." [48] Similar exceptions are found in many Berne member countries, and serve to balance the interests of authors and the public. [49] Architecture is a public art form and is enjoyed as such. Millions of people visit our cities every year and take back home photographs, posters, and other pictorial representations of prominent works of architecture as a memory of their trip. Additionally, numerous scholarly books on architecture are based on the ability to use photographs of architectural works.

These uses do not interfere with the normal exploitation of architectural works. Given the important public purpose served by these uses and the lack of harm to the copyright owner's market, the Committee chose to provide an exemption, rather than rely on the doctrine of fair use, which requires ad hoc determinations. After a careful examination of the provisions of the Berne Convention, the laws of other Berne member countries, and expert opinion, the Committee concluded that this exemption is consistent with our obligations under the Convention. [50]

Subsection (b) provides a limitation on the copyright owner's right—under section 106(2) of title 17, United States Code—to prepare derivative works. Subsection (b) permits the owner of a building embodying a protected architectural work to "make or authorize the making of alterations to such building, and to destroy or authorize the destruction of such building" without the copyright owner's consent. [51] With respect to the right to destroy a building embodying a protected architectural work, the provision is consistent with existing section 109(a) of title 17, United States Code. Section 109(a) permits the owner of a particular copy or phonorecord lawfully made to "sell or otherwise dispose of the possession of that copy of phonorecord." While the provisions of section 109(a) apply

---

[48] As introduced, Section 4 of H.R. 3990 limited the exemption in section 102(a) to instances where the architectural work was "located in a public place." The Subcommittee added the phrase "or ordinarily visible from" after the works "located in" to broaden the exemption to include buildings located on private property but visible from a public place. Nothing in this amendment permits or condones trespassing in order to make such pictorial representations.

[49] These include the Central African Republic (Article 15); Chile (Articles 43, 44); Colombia (Article 44); Congo (Article 7); Costa Rica (Article 71); Czechoslovakia (Article 32); Denmark (Article 25); Finland (Article 25); Federal Republic of Germany (Article 59(1)); India (Articles 52(s), (x)); Ireland (Article 12(3)(b)); Israel (Article 2); Luxembourg (Article 21); Mexico (Article 18(c)); Morocco (Article 20); New Zealand (Articles 20(3)–(5)); Norway (Article 23); Pakistan (Articles 57(1)(s) & (t)); Peru (Article 72); Poland (Articles 20(5) & (6)); Rwanda (Article 18(4)); Senegal (Article 14); South Africa (Articles 10(2) & (4)); Sweden (Article 25); Switzerland (Article 30(g)(3)); Tunisia (Article 14); United Kingdom (Articles 59 (1) & (2), 62); Uruguay (Article 44 (c)(2)); Venezuela (Articles 44(3)); Yugoslavia (Articles 48(4) & (5); 49(5)). Cf. Belgium Article 21bis (reproduction permissible only where necessary for reporting current events; Iceland (Article 16; where the architectural work forms the chief motif of the two-dimensional reproduction, the author is entitled to remuneration); Japan (Article 46; "imitative reproductions" are not permitted, nor reproductions whose purpose is exclusively the selling of copies of the work); Netherlands (Article 18; similar to Iceland). French case law makes distinctions similar to those found in the Icelandic statute. See Huet, "Architecture and Copyright," 19 UNESCO Copyright Bulletin 18 (1985).

[50] The American Institute of Architects (AIA) proposed an amendment to section 120(a) prohibiting pictorial representations made in order to further the unauthorized design and construction of a substantially similar architectural work. The Subcommittee believed such an amendment was unnecessary. If an unauthorized substantially similar architectural work is constructed, it is irrelevant how the design of the infringing building is achieved so long as the design is not independently created.

The proposed AIA amendment might also interfere with scholarly and noncompetitive analysis of architectural works, and with the ability of photographers to pursue their livelihood. The American Society of Magazine Photographers wrote to the Subcommittee opposing the AIA amendment on this ground.

[51] This provision was supported by all witnesses at the Subcommittee's hearing. See Architectural Design Hearings, supra note 4.

23

to architectural works, in light of the fact that architectural works represent a new category of protected subject matter, and unlike other forms of subject matter are habitable, the Committee believed it advisable to spell out expressly the limitations contained in section 120(b).[52]

### Section 205.—Preemption

Section 205 amends section 301(b) of title 17, United States Code, by adding a new paragraph (4). The new provision provides that state and local landmark, historic preservation, zoning, or building codes relating to architectural works protected under section 102(a)(8) are not preempted by the Copyright Act. These codes will, accordingly, not be affected by passage of the bill.

### Section 206.—Effective Date

The bill is prospective, protecting: (1) "architectural works created on or after the date of enactment"; and, (2) "architectural works that on the date of enactment are unconstructed and embodied in unpublished plans or drawings." This latter form of protection is subject to possible termination on December 31, 2002 depending on whether the work has been constructed by that date, and is derived from the bill's definition of architectural work. Under the definition, an architectural work can be embodied in any tangible medium of expression, including architectural plans or drawings. An architectural work that has not been constructed before the date of enactment, but which has been embodied in plans or drawings which themselves are unpublished on the date of enactment, is protected under the bill against unauthorized construction that occurs on or after the date of enactment.[53] The result does not violate prohibitions against retroactivity since the activity giving rise to liability—construction of a substantially similar architectural work—can only occur on or after the date of enactment, and since the architectural work is embodies in subject matter that is itself already protected under the Copyright Act, namely, unpublished plans or drawings.

[52] The proposed legislation does not amend section 106 of title 17, United States Code, regarding "Exclusive rights in copyrighted works". Accordingly, the owner of copyright in an architectural work is granted a right of reproduction, a right to prepare derivative works (limited, however, by section 120(b)), and a right to distribute the architectural work, but it is not given a right to publicly perform or publicly display the architectural work. The right of public performance has no applicability to architectural works. While the right to publicly display an architectural work would have some benefit to copyright owners, the right would conflict with section 120(a), and, further, is not required by the Berne Convention.

The Committee considered the question of moral rights for architectural works. None of the witnesses at the Subcommittee's March 14, 1990 hearing testified in favor of an express statutory grant of such rights. Accordingly, the bill does not contain an express or implied statutory grant of moral rights. Architects' moral rights will, therefore, be governed by the law as currently exists. See Berne Convention Implementation Act of 1988, Public Law 100–568, sec. 3(b), 102 Stat. 2853.

[53] The Subcommittee deliberately limited this provision to architectural works embodied in unpublished plans or drawings, rather than using the broader term "any tangible medium of expression" contained in the definition of "architectural work." The purpose of the exception is to encourage architects who have kept drawings and plans private to disclose them free of fear that disclosure will result in lack of protection against a substantially similar constructed architectural work.

24

This provision does, however, raise the question of term of protection. To aid copyright owners, the public, and the courts, the Committee believes it would be helpful to explain in some detail the various terms of protection that will vest under the bill.

### Architectural Works created on or after the date of enactment

These works will be governed by section 302 of title 17, United States Code: that is, works created by individuals will have a copyright measured by the life of the author plus 50 years; works created under a work-made-for-hire arrangement, anonymously, or under a pseudonym will have a copyright measured from 100 years from creation or 75 years from publication, whichever occurs first. The Committee considered, but rejected, amending the Copyright Act to provide a special definition of publication of an architectural work. Instead, the general definition in section 101, title 17, United States Code, will apply.[54]

### Architectural Works unconstructed on the date of enactment

The term of protection for architectural works unconstructed on the date of enactment and embodied in unpublished plans or drawings will be governed by sections 302 and 303 of title 17, United States Code. In order to encourage authors of architectural works to construct their unpublished creations, a provisional cut-off date of December 31, 2002, has been provided: works that would ordinarily be eligible for a term of protection continuing past that date will lose protection on that date if the architectural work has not been constructed.[55] The actual term will vary depending upon a number of factors, including whether the work was created by an individual, or under a work-made-for-hire arrangement, or whether the work is published before December 31, 2002,[56] but two basic categories may be identified. Within each category, two examples are given, illustrating the relevant principle governing the calculation of term.

1. *Works created by individuals.*—These works will be governed in the first instance by the life plus 50 years post mortem auctoris term in section 302 of title 17, United States Code:

   A. Author dies in 1990. Term will expire in 2040 under section 302; however, under the bill the term will expire on December 31, 2002 unless the architectural work is constructed by that date.

   B. Author died in 1940. Under section 303, the term will expire on December 31, 2002, unless the architectural work is constructed and published before that date, in which case protection will expire on December 31, 2027.

---

[54] " 'Publication' is the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. The offering to distribute copies or phonorecords to a group of persons for purposes of further distribution, public performance, or public display, constitutes publication. A public performance or display of a work does not of itself constitute publication."

[55] This date is derived from section 303, title 17, United States Code.

[56] The definition of "publication" in the 1976 Copyright Act is to be used in making these determinations. The term of protection for the plans and drawings embodying the architectural work is unaffected by this bill. Since architectural plans and drawings represent a separate category of authorship from architectural works, publication of plans and drawings is not publication or an architectural work.

2. *Works created under work-made-for-hire.*—These works will be governed in the first instance by the term set forth in section 302 of title 17, United States Code: 100 years from the date of creation; the 75 year term for published works made-for-hire will not apply, since the provisions of section 6 of the proposed legislation are limited to architectural works that are unconstructed on the date of enactment.

A. Work is created in 1902. Term will expire on December 31, 2002, unless the work is constructed and published before that date, in which case the term will expire on December 31, 2027.

B. Work is created in 1950. Term will expire 2050, unless the work is not constructed by December 31, 2002, in which case protection will expire on that date.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report. The Committee has oversight over the functioning of the Copyright Act, including the administrative responsibilities of the Copyright Office, and conformity of American law to our treaty (bilateral and multilateral) responsibilities.

### COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(1)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

### CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(C)(3) of rule XI of the Rules of the House of Representatives the Committee sets forth, with respect to the bill H.R. 5498, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. CONGRESS,
CONGRESSIONAL BUDGET OFFICE,
*Washington, DC, September 21, 1990.*

Hon. JACK BROOKS,
*Chairman, Committee on the Judiciary,*
*U.S. House of Representatives, Washington, DC.*

DEAR MR. CHAIRMAN: The Congressional Budget Office has reviewed H.R. 5498, the Copyrights Amendments Act of 1990, as ordered reported by the House Committee on the Judiciary, Septem-

26

ber 18, 1990. We estimate that the bill would result in additional annual costs to the Copyright Office of about $100,000. These costs would be at least partially offset by receipts collected for the registration of copyrighted material or recordation of certain computer software.

Title I would prohibit the rental, lease, or loan of computer software programs for purposes of commercial advantage, with certain exceptions. This title would require the Register of Copyrights to establish regulations to administer this provision and to report within three years on the effects of the bill. In addition, the Register of copyrights would be required to record and maintain documents regarding computer shareware. Based on information from the Copyright Office, these provisions would not result in significant costs or additional receipts.

Title II would expand existing copyright protections to architectural works. Under this title, the Copyright Office would be charged with preparing new forms, reviewing copyright applications, and cataloging registrations. CBO estimates that these duties would result in annual costs of about $100,000. These costs would be offset to a significant extent by filing fees paid by persons who wish to register copyrights for architectural works. Based on information from the Copyright Office, these fees could total up to $100,000 each year. However, the actual collections would depend on the number of applications, which is very uncertain. If you wish further details on this estimate, we will be pleased to provide them. The staff contact is Laura Carter, who can be reached at 226–2860.

Sincerely,

ROBERT D. REISCHAUER,
*Director.*

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 5498 will have no significant inflationary impact on prices and costs in the national economy.

## CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

# TITLE 17, UNITED STATES CODE

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## CHAPTER 1—SUBJECT MATTER AND SCOPE OF COPYRIGHT

Sec.
101. Definitions.
102. Subject matter of copyright: In general.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

119. Limitations on exclusive rights: Secondary transmissions of superstations and network stations for private home viewing.
*120. Scope of exclusive rights in architectural works.*

## § 101. Definitions

As used in this title, the following terms and their variant forms mean the following:

An "anonymous work" is a work on the copies or phonorecords of which no natural person is identified as author.

*An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

A work is a "Berne Convention work" if—
(1) \* \* \*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(3) in the case of an audiovisual work—
(A) \* \* \*
(B) if one or more of the authors is an individual, that author is domiciled, or has his or her habitual residence in, a nation adhering to the Berne Convention; 【or】
(4) in the case of a pictorial, graphic, or sculptural work that is incorporated in a building or other structure, the building or structure is located in a nation adhering to the Berne Convention【.】; or
*(5) in the case of an architectural work embodied in a building, such building is erected in a country adhering to the Berne Convention.*

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

## § 102. Subject matter of copyright: In general

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly

28

or with the aid of a machine or device. Works of authorship include the following categories:

(1) * * *

*     *     *     *     *     *     *

(6) motion pictures and other audiovisual works; 【and】

(7) sound recordings【.】*; and*

*(8) architectural works.*

*     *     *     *     *     *     *

## § 106. Exclusive rights in copyrighted works

Subject to sections 107 through 【119】 *120,* the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(1) * * *

*     *     *     *     *     *     *

## § 109. Limitations on exclusive rights: Effect of transfer of particular copy or phonorecord

(a) * * *

【(b)(1) Notwithstanding the provisions of subsection (a), unless authorized by the owners of copyright in the sound recording and in the musical works embodied therein, the owner of a particular phonorecord may not, for purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord by rental, lease, or lending, or by any other act or practice in the nature of rental, lease, or lending. Nothing in the preceding sentence shall apply to the rental, lease, or lending of a phonorecord for nonprofit purposes by a nonprofit library or nonprofit educational institution.】

*(b)(1)(A) Notwithstanding the provisions of subsection (a), unless authorized by the owners of copyright in the sound recording or the owner of copyright in a computer program (including any tape, disk, or other medium embodying such program), and in the case of a sound recording in the musical works embodied therein, neither the owner of a particular phonorecord nor any person in possession of a particular copy of a computer program (including any tape, disk, or other medium embodying such program), may, for the purposes of direct or indirect commercial advantage, dispose of, or authorize the disposal of, the possession of that phonorecord or computer program (including any tape disk, or other medium embodying such program) by rental, lease or lending, or by any other act or practice in the nature of rental, lease, or lending. Nothing in the preceding sentence shall apply to the rental, lease, or lending of a phonorecord for nonprofit purposes by a nonprofit library or nonprofit educational institution. The transfer of possession of a lawfully made copy of a computer program by a nonprofit educational institution to another nonprofit educational institution or to a faculty, staff, and students does not constitute rental, lease, or lending for direct or indirect commercial purposes under this subsection.*

*(B) This subsection does not apply to—*

*(i) a computer program which is embodied in a machine or product and which cannot be copied during the ordinary operation or use of the machine or product; or*

29

(ii) a computer program embodied in or used in conjunction with a limited purpose computer that is designed for playing video games and may be designed for other purposes.

(C) Nothing in this subsection affects any provision of chapter 9 of this title.

(2)(A) Nothing in this subsection shall apply to the lending of a computer program for nonprofit purposes by a nonprofit library, if each copy of a computer program which is lent by such library has affixed to the packaging containing the program warning of copyright in accordance with requirements that the Register of Copyrights shall prescribe by regulation.

(B) Not later than three years after the date of the enactment of the Computer Software Rental Amendments Act of 1990, and at such times thereafter as the Register of Copyright considers appropriate, the Register of Copyrights, after consultation with representatives of copyright owners and librarians, shall submit to the Congress a report stating whether this paragraph has achieved its intended purpose of maintaining the integrity of the copyright system while providing nonprofit libraries the capability to fulfill their function. Such report shall advise the Congress as to any information or recommendations that the Register of Copyrights considers necessary to carry out the purposes of this subsection.

〖(2) (3) Nothing in this subsection shall affect any provision of the antitrust laws. For purposes of the preceding sentence, "antitrust laws" has the meaning given that term in the first section of the Clayton Act and includes section 5 of the Federal Trade Commission Act to the extent that section relates to unfair methods of competition.

〖(3) Any person who distributes a phonorecord in violation of clause (1) is an infringer of copyright under section 501 of this title and is subject to the remedies set forth in sections 502, 503, 504, 505, and 509. Such violation shall not be a criminal offense under section 506 or cause such person to be subject to the criminal penalties set forth in section 2319 of title 18.〗

(4) Any person who distributes a phonorecord or a copy of a computer program (including any tape, disk, or other medium embodying such program) in violation of paragraph (1) is an infringer of copyright under section 501 of this title and is subject to the remedies set forth in sections 502, 503, 504, 505, and 509. Such violation shall not be a criminal offense under section 506 or cause such person to be subject to the criminal penalties set forth in section 2319 of title 18.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(e) Notwithstanding the provisions of sections 106(4) and 106(5), in the case of an electronic audiovisual game intended for use in coin-operated equipment, the owner of a particular copy of such a game lawfully made under this title, is entitled, without the authority of the copyright owner of the game, to publicly perform or display that game in coin-operated equipment, except that this subsection shall not apply to any work of authorship embodied in the audiovisual game if the copyright owner of the electronic audiovisual game is not also the copyright owner of the work of authorship.

\*　　\*　　\*　　\*　　\*　　\*　　\*

30

### § 120. Scope of exclusive rights in architectural works

*(a) PICTORIAL REPRESENTATIONS PERMITTED.—The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.*

*(b) ALTERATIONS TO AND DESTRUCTION OF BUILDINGS.—Notwithstanding the provisions of section 106(2), the owners of a building embodying an architectural work may, without the consent of the author or copyright owner of the architectural work, make or authorize the making of alterations to such building, and destroy or authorize the destruction of such building.*

\*  \*  \*  \*  \*  \*  \*

## CHAPTER 3—DURATION OF COPYRIGHT

\*  \*  \*  \*  \*  \*  \*

### § 301. Preemption with respect to other laws

(a) \* \* \*

(b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to—

(1) \* \* \*

(2) any cause of action arising from undertakings commenced before January 1, 1978; 【or】

(3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106【.】; or

*(4) State and local landmarks, historic preservation, zoning, or building codes, relating to architectural works protected under section 102(a)(8).*

\*  \*  \*  \*  \*  \*  \*

○